UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

―――――――――――――――――――――――

SUSAN JANE PALASCAK,

                Plaintiff,

      -vs-

CAROLYN COLVIN, Commissioner of
Social Security,

                Defendant.

―――――――――――――――――――――――

**DECISION and ORDER
No. 1:11-CV-0592(MAT)**

## I.   Introduction

Susan Jane Palascak ("Plaintiff"), represented by counsel, brings this action pursuant to Title II of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner")[1] denying her application for Disability Insurance Benefits ("DIB"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.   Procedural History

Plaintiff filed her application for DIB on November 18, 2008, alleging disability beginning February 15, 2006, due to back pain,

---

[1] Carolyn W. Colvin has replaced Michael J. Astrue as the Commissioner of Social Security. She therefore is automatically substituted as the defendant in this action pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

a torn rotator cuff, and arthritis. T.121.[2] After the application was denied, T.68, 70-74, Plaintiff requested a hearing before an administrative law judge. On September 15, 2010, Plaintiff and her representative appeared before administrative law judge Eric Glazer ("the ALJ") for the hearing. See T.9, 31-67, 78-106. The ALJ issued a decision on October 27, 2010, finding Plaintiff not disabled. T.12-26. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on May 17, 2011. T.1-6. This timely action followed.

## III. Background

### A.    Medical Evidence Prior to the Onset Date

On July 28, 1998, Plaintiff was referred by Naren Kansal, M.D. to physical therapy for lumbar pain with radiculopathy. T.227. Plaintiff reported episodic back pain for several years. One month ago, she developed right foot paresthesias and increased pain on sitting. She was discharged on August 25, 1998, after 11 treatments, and the physical therapist noted that her lumbar pain with radiculopathy was resolved. T.228.

Plaintiff returned to the physical therapist on August 15, 2000, with severe left lower extremity pain with numbness into the left lateral foot, along with severe leg cramping and shooting pains into the posterior thigh with increased intensity in the

---

[2]

Numerals preceded by "T." refer to pages from the transcript of the administrative record submitted by Defendant as a separately bound exhibit.

posterior knee. T.229. Plaintiff had difficulty sitting, standing, and lying down. She was "unable to do functional activities without severe pain." T.229. Plaintiff stopped attending therapy several weeks into the program because she was doing well and did not feel she needed further therapy.  She was discharged on December 8, 2000. T.232.

On December 21, 2000, Plaintiff saw Drs. Frederick McAdam and Paul Olizarowicz at Buffalo Spine & Sports Medicine, P.C., in follow-up after receiving an epidural injection for her low back and lower extremity pain secondary to a disc herniation at L5-S1. The epidural resulted in "[i]mproved symptomatology" but she still was taking hydrocodone 7.5 mg, as needed. She was performing a home exercise program after completing a course of physical therapy and chiropractic care. Drs. Olizarowicz and McAdam noted that her past medical history was significant for an anxiety disorder. T.247. She was to follow up with them as needed. Id.

On January 28, 2002, Plaintiff saw Dr. Michael Parentis for evaluation of her left knee. She explained that she had been trying out some cheerleading moves with her daughter and her friends, and when she landed, her knee buckled. She felt a "pop" and was unable to stand. T.254. Dr. Parentis noted there was a very mild effusion of the knee, medial joint line tenderness, and significant pain medially upon meniscal grind testing. T.254. Plaintiff elected to have an arthroscopy rather than continue with conservative

management (anti-inflammatories and a steroid injection). T.255. On February 8, 2002, Plaintiff underwent a successful left knee arthroscopy and partial medial, performed by Dr. Parentis. T.256-57. Subsequent treatment notes from Dr. Parentis indicate that Plaintiff developed a deep vein thrombosis ("DVT") following the arthroscopy, T.259, but there are no records related to the DVT in the administrative record.

In May of 2003, Plaintiff saw her primary care physician Shawn E. Cotton, M.D. with complaints of recurrent depression, anxiety, panic attacks, and attention deficit disorder. T.522, 525.

On January 27, 2005, Plaintiff returned to see Dr. Parentis after she slipped while knocking down icicles from her roof. She had significant pain and swelling in her right knee. T.259. X-rays revealed a small knee joint effusion along with minimal patellar spurring and minimal distal femoral and proximal tibial spurring. The impression was "mild degenerative changes." T.253. Dr. Parentis opined that the injury was just a strain and advised conservative treatment. T.259.

**B.   Medical Evidence from February 16, 2006, to June 30, 2006 (The Date Last Insured)**

On February 17, 2006, physician's assistant Robin Massing ("PA Massing") at Dr. Cotton's office evaluated Plaintiff, who had been having right shoulder pain for the past 3 weeks. The pain was exacerbated by reaching and putting on clothes, but there was no weakness, numbness, swelling, or tingling. T.311-12. Examination

-4-

revealed tenderness in the right bicep region and increasing pain with internal and external rotation and resisted elevation. Motor and grip strengths were more than full at 5+/5. Deep tendon reflexes were equal bilaterally in the upper extremities, and there were no focal deficits. T.311. An x-ray of the right shoulder was unremarkable. T.252. PA Massing assessed right shoulder pain caused by a rotator cuff tear and tendinitis, and prescribed lortab and diclofenac. T.311-12.

At a follow-up visit on February 27, 2006, Plaintiff reported that her shoulder was still very painful, with increasing pain when she lifted, pushed, and pulled. T.308-09. She stated that prednisone had provided slight improvement. Upon examination, PA Massing observed some palpable tenderness. PA Massing assessed right rotator cuff tendinitis, referred Plaintiff to physical therapy, and continued prednisone for one week, to be followed by Daypro. T.308. If there was no improvement, an MRI or orthopedic referral was indicated. Id.

At a March 3, 2006 examination at East Aurora Family Practice, Plaintiff complained of right shoulder pain for the past 3 months unrelieved by prednisone. T.306-07. On examination, Plaintiff had decreased movement in her right shoulder and pain during movement. T.307. The "probable" cause of the pain was right shoulder impingement. Id. Plaintiff received an injection of Kenalog and Depomedrol in her right shoulder. Id.

-5-

On April 10, 2006, Physician's Assistant Matthew Mazurczak ("PA Mazurczak") at Dr. Parentis' office evaluated Plaintiff for complaints of right shoulder pain, which flared up at work. T.260. On examination, Plaintiff's had full strength and range of motion in her right shoulder; she had no pain on cross-arm conduction, Speed's testing, or over the biceps; but there was an exquisitely positive Hawkins' sign. PA Mazurczak diagnosed right-sided subacromial impingement, and injected the space with a mixture of Marcaine, Lidocaine, and Kenalog. T.260. Dr. Parentis reviewed and agreed with this course of treatment. Id.

On May 12, 2006, Dr. Parentis performed right shoulder diagnostic arthroscopy, arthroscopic subacromial decompression, and mini-open rotator cuff repair fixed with 2 arthrex corkscrew metal anchors. T.261-62. Plaintiff tolerated the procedure well. T.262.

Plaintiff attended a PT appointment on May 16, 2006, complaining of constant right shoulder and upper arm pain, causing her to be unable to sleep. Plaintiff reported aggravation of symptoms on reaching overhead/behind, personal care activities, donning/doffing clothing, sleeping 1 to 2 hours, lifting 2 pounds, driving, writing, and opening doors and jars. At that time, Plaintiff was waiting to be admitted to an alcohol rehabilitation program. T.364. Physical therapy with various modalities was recommended biweekly for 4 weeks. T.365.

On May 23, 2006, Plaintiff returned to see Dr. Parentis for follow-up and reported that she was quite sore. T.263. Dr. Parentis commented, "[o]f note, she had her x-ray done and when she was moving her body she had increasing discomfort. I think this is just some scar." T.263. X-rays were normal, showing good positioning of the anchors and a "Type I" acromion. Dr. Parentis noted that Plaintiff was "having a lot pain" but he thought it was "just standard with some lysis of adhesions." Id. continue with passive motion exercises at therapy for the time being. Id.

At a June 13, 2006 physical therapy session, Plaintiff reported that her right shoulder soreness had improved with antibiotics. T.362-63. Plaintiff reported aggravation of symptoms with reaching overhead and behind, personal care activities, donning/doffing clothing, sleeping 3 hours and lifting 2 pounds. T.363.. Plaintiff was "progressing slowly" and would benefit from continued treatment, including cold therapy, electrical stimulation, functional training, self-care/home management, home exercise, isotonic strengthening, and posterior shoulder stabilization exercises. T.363. Active range of right shoulder flexion had increased to 170 degrees, and passive flexion had increased to tolerance. Plaintiff was unable to lift her arm against gravity. Id.

Dr. Parentis examined Plaintiff on June 26, 2006, and noted that she was doing reasonably well. Some of her discomfort was

-7-

starting to dissolve, and her incision was well-healed. On examination, she had full range of motion with a "little bit" of discomfort. She had full (5/5) strength with external rotation and mildly reduced (4-/5) strength with forward flexion. Dr. Parentis noted that "[o]verall the shoulder is starting to come around. At this point we can really start to work on strengthening." T.264. He expected to see significant improvement in six weeks time. Id.

A June 27, 2006 PT discharge summary indicated that Plaintiff had failed to show for, or cancelled, additional appointments since June 20, 2006, due to her admission to an out-of-state alcohol rehabilitation program, where she underwent a more progressive strength and home exercise regime. T.362. Her scapular strength was "improving" but she was still "very weak". Id.

### C. Medical Evidence After the June 30, 2006 Date Last Insured

On July 21, 2006, Plaintiff saw PA Andrea Fisher at Dr. Cotton's office after being discharged recently from White Deer Run Medical Center ("WDRMC") for alcohol withdrawal. T.303. Plaintiff was complaining of depression and dehydration; she had contracted an intestinal parasite at WDRMC and had been having diarrhea for 24 days in a row. While she was at WDRMC, she was put on Vistaril, Robaxin, Sinequan, Cymbalt, Lamictal, Lisinopril, and Pen-Vee-K. T.303. PA Fisher added Zyprexa for anxiety and Toprol for hypertension. Id.

In October 2007, Plaintiff was referred to Dr. Kang for mental health treatment after she verbalized plans of self-harm while intoxicated. T.344-46, 357-61. The only report from Dr. Kang's office is the note dictated on March 18, 2009, over the telephone by Ellen Silver, LCSW ("LCSW Silver") at the request of the state disability agency. Id. LCSW Silver noted that Plaintiff's diagnoses were major depression, recurrent; panic disorder; alcohol abuse; and a history of attention deficit disorder. T.345. According to LCSW Silver, Plaintiff had a history of recurrent episodes of depression and anxiety for 16 years and sought psychiatric help over those years.[3]

On October 3, 2008, Plaintiff saw PA Mazurczak at Dr. Parentis' office with complaints of a new problem with her right knee. T.265-66. PA Mazurczak injected the knee with a mixture of Marcaine, lidocaine, and Kenalog. T.265. She was instructed to return in 2 weeks for an MRI if the injection did not provide relief.

Also on October 3, 2008, Plaintiff saw Dr. Cotton complaining of being unable to sit or stand for more than about an hour at a time due to radiating pain in her right hip. She was tearful and depressed but looking forward to future events (e.g., going back to

---

[3]

Although LCSW Silver indicates that Plaintiff sought treatment for her depression and anxiety for 16 years, there are no other records from a mental health provider in the administrative record. Plaintiff's attorney indicated at the hearing that the record was complete.

school).   T.277.   Her   past   medical   history   was   notable   for depression/panic attacks. Id. Dr. Cotton diagnosed chronic pain syndrome and major depression, not otherwise specified. T.278. See also T.279-80 (Dr. Cotton's notes from October 20, 2008).

Plaintiff saw Dr. Cotton on August 10, 2008, complaining of depression and chronic pain (muscle aches, lower back pain with movement, joint pain and stiffness, and leg cramps). T.285. Her medications were Topamax, Keflex, MS Contin, Cymbalta, Lyrica, Lamisil, lisinopril, metoprolol, doxepin, and Prempro. T.284. Dr. Cotton diagnosed chronic pain syndrome and venous insufficiency. T.285.

On November 13, 2008, Plaintiff returned to Dr. Parentis' office with complaints of bilateral shoulder pain that was worsening every week. Plaintiff told PA Mazurczak that at her first post-op visit after her right rotator cuff repair in 2006, she was "getting an x-ray and felt a pop. Ever since she says she is [sic] not felt completely better." T.266. PA Mazurczak noted that Plaintiff might have a re-tear of her right shoulder rotator cuff and possibly an impingement of the left shoulder. Id. Plaintiff was scheduled for an MRI arthrogram of the right shoulder, id., which revealed a large, "significantly" atrophied and retracted rotator cuff tear. T.267.

On November 21, 2008, Plaintiff saw PA Mazurczak in follow-up regarding her right shoulder, complaining of "extreme pain." T.267.

-10-

PA Mazurczak injected the right shoulder subacromial space with a mixture of Marcaine, lidocaine, and Kenalog. Id. Because she "can no longer live at [sic] this[,]" PA Mazurczak scheduled her for a right shoulder debridement and possible repair (although the chance for repair was probably 10% or less). He also ordered an MRI arthrogram of the left shoulder. Id. His assessment was rotator cuff arthropathy and a significantly retracted rotator cuff tear. T.267.

On January 12, 2009, Dr. Parentis performed a right shoulder diagnostic arthroscopy with subacromial decompression, distal clavicle excision, and overall joint debridement and synovectomy. T.268-71. However, the right rotator cuff was irreparable. Id.

Plaintiff attended physical therapy at Partners In Rehab beginning January 14, 2009, and was discharged May 4, 2009, due to poor patient follow-up/attendance. T.366-74. At discharge, Plaintiff was "overall . . . doing good" but was "limited by her pain and strength." T.374. She had full passive range of motion of her right shoulder but had overall weakness in that area. Id.

On January 27, 2009, Plaintiff returned to PA Mazurczak at Dr. Parentis' office for her two-week post-op visit. She was still having pain in her right shoulder. She had good passive range of motion but a lot of pain with active range of motion. The PA was unable to test her strength. T.271. His assessment was that Planitiff had a "chronically torn" rotator cuff with arthropathy

and a left-sided full-thickness rotator cuff tear. T.271. Both shoulders were injected with a mixture of Marcaine, lidocaine, and Kenalog. Id. Surgery for her left rotator cuff was expected to be done in 2 to 3 weeks. Id.

On March 11, 2009, Plaintiff saw Dr. Cotton, reporting increased difficulty with concentration and feeling overwhelmed. Plaintiff was tearful but denied suicidal thoughts or plans. T.272. She was taking MS Contin, Lyrica, Prempro, Wellbutrin XL, Cymbalta, lisinopril, metoprolol, doxepin, and Ritalin. T.272. Dr. Cotton's diagnoses were chronic pain syndrom; major depression, not otherwise specified; insomnia; hypertension; menopausal and postmenopausal disorder, unspecified; attention deficit disorder, without mention of hyperactivity. T.273.

In August 2009, Plaintiff underwent bunionectomy surgery. T.376-79, 397-98. From June 2008, to November 2009, Plaintiff had a number of issues related to her toes and feet, including acute gouty attacks, arthritis, significant mycosis of the nails, and paronychia. T.353, 393-401. She treated with podiatrist Anthony F. Devincentis, M.D. Id.

On September 1, 2009, Plaintiff was in a motor vehicle accident ("MVA"), which resulted in chronic cervical pain. She saw neurologist Kenneth Murray, M.D. on November 25, 2009, whose impression was that she had suffered acute exacerbation of chronic pain related to fibromyalgia due to the MVA, and that she also had

suffered a cervical strain injury. Her pain at that time was debilitating in nature, and she was having symptoms down both upper extremities suggestive of possible radiculopathy. T.445.

Plaintiff received physical therapy from Partners In Rehab from October 12, 2009, to November 9, 2009. T.382-89. She was discharged due to lack of continued progression, although the physical therapist had opined that her prognosis was good. T.386, 389.

When she returned on December 9, 2009, Dr. Murray commented that "[s]ubjectively, her pain was unrelenting and severe," T.446, and she was not experiencing any relief with the Lidoderm patches or Cymbalta. T.445. Dr. Murray reiterated his opinion that she suffered acute exacerbation of chronic pain related to fibromyalgia due to the MVA, and that there was "disability stemming from that accident." T.446. Dr. Murray discontinued Cymbalta and started her on Savella; if her mood worsened despite the anti-depressive effects of Savella, she should restart citalopram. T.448.

Plaintiff was referred to neurologist Eugene Gosy, M.D., who treated her from March 3, 2010, to June 23, 2010. T.433-41, 445-51, 476-92. Dr. Gosy's diagnoses were cervicalgia, myofascial pain syndrome, brachial neuritis or radiculitis, not otherwise specified, and depressive disorder not otherwise specified. He prescribed Norco and Skelaxin. T.435.

In May 2010, she commenced treatment with rheumatologist Dr. Carlos Martinez, who diagnosed her with myofascial pain syndrome. T.463-73; repeated T.505-12, 514-15.

Additionally, Plaintiff continued receiving treatment from Dr. Cotton East Aurora Family Practice for various conditions, including chronic pain syndrome, anxiety/panic attacks, depression, acute renal failure due to a combination of over-the-counter gingko biloba diet pills and prescribed medications (Effexor XR, Lyrica, doxepin, Vistaril pamoate), and bilateral deep vein thrombosis. T.272-305, 403-31, 454-61, 539-40. When Plaintiff saw Dr. Cotton on March 29, 2010, he noted that Dr. Gosy had discontinued gabapentin, administered a cervical epidural, and started her on baclofen and lortab. However, her pain level was "the same or worse." T.459.

## IV. General Legal Principles

### A. Eligibility Standards for DIB

In order to be entitled to DIB under Title II of the Act, a claimant must establish that she became disabled prior to the expiration of her insured status. 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1). To establish disability for purposes of DIB, the claimant must demonstrate that she is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment, or combination of impairments, which has lasted, or can be expected to last, for a continuous period of at least 12 months. 42 U.S.C. §§ 423(d)(1)(A). A disabling physical

or mental impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The five-step sequential evaluation for adjudicating disability claims is set forth in 20 C.F.R. §§ 404.1520 and 416.920. The claimant bears the burden of proof at steps 1 through 4, at which point there is a limited burden-shift to the Commissioner to demonstrate that there is other work in the national economy that the claimant can perform. Curry v. Apfel, 209 F.3d 117, 122-23 (2d Cir. 2000).

Evidence of an impairment which reached disabling severity after the expiration of insured status, or which was exacerbated after such expiration, cannot be the basis for entitlement to a period of disability and disability insurance benefits, even though the impairment itself may have existed before the claimant's insured status expired. See Arnone v. Bowen, 882 F.2d 34, 37-38 (2d Cir. 1989) ("A 'period of disability' can only commence, however, while an applicant is 'fully insured.' . . . [R]egardless of the seriousness of his present disability, unless [the claimant] became disabled before [the date last insured], he cannot be entitled to benefits.") (citations omitted)). In the present case, Plaintiff's date last insured was June 30, 2006.

**B.    Standard of Review**

Under the Act, the "findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In reviewing the Commissioner's decision, a court will set aside the "decision only where it is based upon legal error or is not supported by substantial evidence." Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). An ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).

A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

**V.    The ALJ's Decision**

The ALJ found at step one that Plaintiff had not engaged in substantial gainful employment. He noted that Plaintiff began working in April 2009 for PTM Enterprises, earning $3,644.00 in 2009, and $6,254.00 as of August 23, 2010. T.17. The number of hours she has worked has varied between 10 and 29 per week. Id. At the time of the hearing, Plaintiff was employed in retail sales at a consignment shop. T.17-18. She testified that she arranges

-16-

clothing on selling floor display racks and operates the cash register. Id.

At step two, he noted that Plaintiff had "reported the following severe impairments: right should rotator cuff tear and impingement, lumbar spine degenerative disc disease, L3-4 and L5-S1 disc bulge, and L4-5 disc herniation." T.18. The ALJ found that these impairments "caused significant limitations" in her ability to perform basic work activities. Id. (citation omitted). The ALJ further found that Plaintiff's "medically determinable behavioral health-related impairments of depression, anxiety, and panic attacks did not cause more than minimal limitation" in her "ability to perform basic mental work activities during the period at issue and were therefore nonsevere." Id. The ALJ then completed a Psychiatric Review Technique, considering the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments. See T.18-19. Because the ALJ found that Plaintiff's "medically determinable mental impairment caused no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area, it was nonsevere[.]" T.19 (citing 20 C.F.R. § 404.1520a(d)(1)).

At step three, the ALJ found that Plaintiff's asserted physical impairments did not meet the criteria set forth in Listing

1.02, Major dysfunction of a joint(s) (due to any cause), and Listing 1.04, Disorders of the spine. T.19-20.

At step four, the ALJ found that, "giving the claimant the benefit of the doubt, . . . [she] had the residual functional capacity to perform no less than light work as defined in 20 CFR 404.1567(b) except that she could do no overhead lifting or lifting of heavy objects (over twenty pounds) with the right upper extremity." T.20; see also T.20-24.

At step five, the ALJ concluded that through the date last insured, Plaintiff was capable of performing her past relevant work as a cook for a catering company and teacher's aide because this work did not require the performance of work-related activities precluded by her residual functional capacity.  In addition, he found that Plaintiff could perform work within her residual functional capacity. T.24-25. Accordingly, Plaintiff was found not to be under a disability prior to her date last insured. T.25.

**VI.  Discussion**

  **A.   Improper Interpretation Of Raw Medical Data By The ALJ**

Plaintiff's sole contention on this appeal is that the ALJ erroneously "supported his RFC assessment with his own interpretation of the objective findings on diagnostic studies[,]" and in so doing, "made a medical determination that he was not qualified to make." Plaintiff's Memorandum at 6 (citing Balsamo v. Chater, 142 F.3d 75, 80-81 (2d Cir. 1998); McBrayer v. Secretary of

Health and Human Servs., 712 F.2d 795, 799 (2d Cir. 1983)).
Defendant has not addressed this argument. As discussed further
below, the Court agrees with Plaintiff.

As Plaintiff points out, there are no opinions from an
acceptable medical source during the period from February 15, 2006,
through June 30, 2006, regarding Plaintiff's functional limitations
caused by her multiple physical and mental impairments. The
administrative record reveals that no acceptable medical
source-either one of Plaintiff's treating physicians or a
consultative examiner retained by the SSA-ever has reviewed
Plaintiff's medical history and given an opinion regarding
Plaintiff functional limitations during the relevant period of
time.

Although residual functional capacity determinations are
reserved for the Commissioner, see 20 C.F.R. § 404.1527(e)(2),
"administrative law judges are unqualified to assess residual
functional capacity on the basis of bare medical findings in
instances when there is a relatively high degree of impairment."
Kinslow v. Colvin, Civil Action No. 5:12-cv-1541 (GLS/ESH), 2014 WL
788793, at *5 (N.D.N.Y. Feb. 25, 2014) (citing Hazlewood v.
Commissioner of Social Sec., No. 6:12-CV-798 (DNH/ATB), 2013 WL
4039419, at *5 (N.D.N.Y. Aug. 6, 2013) (citing Walker v. Astrue,
No. 08-CV-828, 2010 WL 2629832, at *6 (W.D.N.Y. June 11, 2010));
see also Deskin v. Commissioner of Social Sec., 605 F. Supp.2d 908,

912 (N.D. Ohio 2008); <u>Isaacs v. Astrue</u>, ___ F. Supp.2d ___, 2009 WL 3672060, at *11 (S.D. Ohio 2009) ("The ALJ rendered her RFC finding for medium work without reference to any medically determined RFC opinion bridging the raw medical data to specific functional limitations. Because there is no medical source opinion supporting the ALJ's finding that the plaintiff can perform 'medium' work, the Court concludes the ALJ's RFC determination is without substantial support in the record")).

Here, the ALJ found that Plaintiff had the RFC to perform "no less than" light work with one limitation–that she could not lift greater than 20 pounds with her right arm. The RFC for light work, however, contemplates the ability to perform sustained work activities in an ordinary work setting on a regular and continuous basis. "A 'regular and continuous basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8, 1996 WL 374184, at *1. Light work requires the ability not only to lift objects weighing up to 20 pounds, but also capacity to carry frequently objects weighing up to 10 pounds. <u>See</u> SSR 83-10, Titles II and XVI: Determining Capability To Do Other Work—The Medical-Vocational Rules of Appendix 2, 1983 WL 31251, at *5 (S.S.A. 1983). It requires ability to stand and walk up to 6 hours in a normal work day, or to sit most of the time with some pushing and pulling of arm-hand or leg-foot controls. <u>Id.</u>

As noted above, no acceptable medical sources expressed opinions about Plaintiff's capacities to engage in work at any exertional level on a regular and continuous basis in an ordinary work setting. There is no medical opinion regarding Plaintiff's capacity to sit, stand, walk, push, lift and pull, which are necessary activities for light work. As discussed below, the ALJ failed to make a function-by-function assessment of Plaintiff's limitations, and thus he did not even specifically opine regarding Plaintiff's capacity to sit, stand, walk, push, lift and pull. Rather, he simply stated that "[a]lthough she had pain complaints, the record did not establish a reasonable basis for disabling pain reports prior to June 2006" because "[h]er activities of daily living included a heavy family schedule with the claimant attending, without limitation, all school functions associated with her middle school and high school level daughters." T.24. Plaintiff testified, however, that she attended her daughters' school functions despite the fact that she experienced significant pain during them. It is unclear to this Court how occasionally attending a school function is equivalent to performing the equivalent of light work, 8 hours a day, for 5 days a week. "[P]erformance of daily activities is not necessarily a clear and convincing reason to discredit a [claimant's] testimony." Provencio v. Astrue, No. CV 11-141-TUC-BPV, 2012 WL 2344072, at *12 (D. Ariz. June 20, 2012) (citing Webb v. Barnhart, 433 F.3d 683, 687-88 (9th Cir. 2005) ("The

mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be 'utterly incapacitated' in order to be disabled.") (quoting <u>Vertigan v. Halter</u>, 260 F.3d 1044, 1050 (9th Cir. 2001) (brackets omitted)).

Where, as here, the medical findings and reports merely diagnose the claimant's impairments without relating the diagnoses to specific physical, mental, and other work-related capacities, the administrative law judge's "determination of residual functional capacity without a medical advisor's assessment of those capacities is not supported by substantial evidence." <u>Id.</u> (citing <u>Hazlewood</u>, 2013 WL 4039419, at *5); <u>see also</u> <u>Deskin</u>, 605 F. Supp.2d at 912. Given Plaintiff's multiple physical and mental impairments, this is not a case where the medical evidence shows "relatively little physical impairment" such that the ALJ "can render a common sense judgment about functional capacity." <u>Manso-Pizarro v. Secretary of Health & Human Servs.</u>, 76 F.3d 15, 17 (1st Cir. 1996).

In sum, because there is no medical source opinion to support the ALJ's residual functional capacity finding, the Court concludes that it lacks substantial evidentiary support. <u>E.g.</u>, <u>House v. Astrue</u>, No. 5:11-CV-915 (GLS), 2013 WL 422058, at *4 (N.D.N.Y. Feb. 1, 2013) (citations omitted); <u>Aceto v. Commissioner of Social Sec.</u>, No. 6:08-CV-169 (FJS), 2012 WL 5876640, at *16 (N.D.N.Y. Nov. 20,

2012) (because "the ALJ had nothing more than treatment records and consultative reports to review, he had an affirmative duty to develop the record and request that Plaintiff's treating physicians assess her RFC"). "A pivotal finding" such as residual functional capacity that is "unsupported by substantial evidence is not a harmless error." Anderson v. Colvin, Civil Action No. 5:12–cv–1008 (GLS/ESH), 2013 WL 5939665, at *9 & n.28 (N.D.N.Y. Nov. 5, 2013) (citations omitted). Remand accordingly is required. See id.

**B.  Other Errors**

The ALJ made a number of other errors that Plaintiff has not raised, but which deserve mention here in order to avoid repeating of them on remand.

The ALJ erred by failing to make a function-by-function assessment of Plaintiff's ability to perform the physical and mental requirements of light-duty work. The Act's regulations require that the ALJ include in his RFC assessment a "function-by-function analysis of the claimant's functional limitations or restrictions and an assessment of the claimant's work-related abilities on a function-by-function basis." Zurenda v. Astrue, No. 11–CV–1114 (MAD/VEB), 2013 WL 1183035, at *4 (N.D.N.Y. Mar. 1, 2013), report and recommendation adopted, 2013 WL 1182998 (N.D.N.Y.  Mar. 21, 2013). In other words, the ALJ "must make a function-by-function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or

crouch." Id. (citing 20 C.F.R. § 404.1513(c)(1); §§ 404.1569a(a), 416.969a(a); Martone v. Apfel, 70 F. Supp.2d 145, 150 (N.D.N.Y. 1999)). The ALJ's RFC assessment simply recites Plaintiff's testimony and summarizes the medical record without tying this evidence to the physical and mental functional demands of light work.

The ALJ's credibility assessment was flawed because he failed to give consideration to the required factors. See Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (citing, inter alia, Valente v. Secretary of Health and Human Servs., 733 F.2d 1037, 1045 (2d Cir. 1984); footnote omitted). Instead, he simply found Plaintiff's statements not credible to the extent they conflicted with his own RFC assessment. "The assessment of a claimant's ability to work will often depend on the credibility of her statements concerning the intensity, persistence and limiting effects of her symptoms." Otero v. Colvin, 12-CV-4757, 2013 WL 1148769, at *7 (E.D.N.Y. Mar. 19, 2013). Thus, it is not logical to decide a claimant's RFC prior to assessing her credibility. To then use that RFC to discredit the claimant's testimony merely compounds the error. Id.

The ALJ also materially misstated the record when he commented, "Psychiatric problems do not enter into the clinical picture until after the date last insured[,]" T.24, i.e., June 30, 2006. Earlier he had noted that Plaintiff had been "treated for

-24-

depression, anxiety, and attention deficit disorder by Balvinder Kang, M.D., but not until 2007." T.20. This is incorrect. The medical record clearly indicates that Plaintiff was being treated for depression, anxiety, and attention deficit disorder prior to the date last insured. For instance, treatment notes from Dr. Cotton from May 6, 2003, state that Plaintiff was in the office "for reevaluation of her depression and anxiety. She has a long history of treatment resistant to depression for which she has been on multiple medications. She also has panic attacks that keep her from driving on many roads." T.522. In addition, while she was in the month-long alcohol rehabilitation program in June-July 2006, she was prescribed Vistaril, Sinequan, Cymbalta, and Lamical for depression and anxiety. The Court notes that Plaintiff's admission to rehab occurred *prior* to the date last insured. Thus, her depression and anxiety were being treated before the date last insured. Furthermore, the note on which the ALJ relied to find that Plaintiff did not see Dr. Kang until 2007 contains an important notation, wholly ignored by the ALJ-that Plaintiff had a 16-year history of recurrent episodes of depression and anxiety and had sought psychiatric help over those years before coming to seek Dr. Kang. It is true, as the ALJ notes, that Plaintiff's attorney indicated that the record was complete. However, the fact that a claimant has an attorney representative does not obviate the ALJ's duty to develop the record fully. Pagan on behalf of Pagan v.

<u>Chater</u>, 923 F. Supp. 547, 553 (S.D.N.Y. 1996) (citations omitted). On remand, the ALJ is directed to obtain the records from the 16 years of mental health treatment referenced in Dr. Kang's note and to obtain a medical source statement from one of Plaintiff's mental health services providers with regard to the period of time at issue. Based upon the contents of these records, a new step two severity determination and residual functional capacity assessment likely will be required.

In addition, the ALJ's phrasing of Plaintiff's RFC is ambiguous. Insofar as he states that she retains the capacity to perform "no less than" light work, he implies that she could perform work at a greater exertional level. Similar ambiguities should be avoided on remand.

## VII. Conclusion

For the foregoing reasons, Defendant's motion for judgment on the pleadings is denied, and Plaintiff's motion for judgment on the pleadings is granted to the extent that the Commissioner's decision is reversed, and the matter is remanded for further administrative proceedings consistent with this Decision and Order.

**SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     May 14, 2014
           Rochester, New York

-26-